UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LAURA A. RENNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 1:16-cv-00895-LJM-DKL |
| ) | |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of the Social Security ) | |
| Administration,[1] ) | |
| ) | |
| Defendant. ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff Laura A. Renner ("Renner") requests judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration (the "Commissioner"), who denied Renner's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C § 423(d). Renner asserts that (1) the ALJ failed to properly assess the credibility of Renner's testimony and (2) the ALJ did not give proper weight to the opinion of Renner's treating physician. *See generally*, Dkt. No. 10. The Commissioner contends that the substantial evidence supports the ALJ's findings and that the ALJ adequately explained his reasoning for finding that Renner was not disabled. *See generally*, Dkt. No. 17.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Nancy A. Berryhill for Carolyn W. Colvin as the named Defendant.

# I. BACKGROUND

## A. PROCEDURAL HISTORY

Renner filed her application for DIB on January 23, 2013, alleging that her disability began on December 22, 2012. R. at 140-143. The claim was denied initially on March 27, 2013, R. at 69-72, and upon reconsideration on May 10, 2013. R. at 74-76. Renner timely requested a hearing before the ALJ on June 5, 2013. R. at 78-79.

On October 9, 2014, the ALJ held a hearing, at which Renner, who was represented by counsel, and a vocational expert testified. R. at 29-51. On October 30, 2014, the ALJ found that Renner was not disabled. R. at 17-25. The Appeals Council denied Renner's request for review on March 2, 2016, rendering the ALJ's decision the final decision of the Commissioner. R. at 1-7. On April 21, 2016, Renner filed the instant appeal pursuant to 42 U.S.C. § 405(g).

## B. AGE, EDUCATION, WORK HISTORY & RENNER'S PERCEPTION OF HER IMPAIRMENTS

Renner was thirty-one years old at the time of the alleged onset date. She has a high school education. Renner has past relevant work experience as a sewer line photo inspector and as a material handler. R. at 33-34, 48. At the hearing on October 9, 2014, Renner testified that she stopped working because of pain in her knees. R. at 35-36. Renner stated that she tried to go back to work in 2012 after having surgery on her knees, but was not able to get in and out of a van, as required for her work as a sewer line photo inspector. *Id.* She further testified that she could not return to her company to perform a less physical job because all of those positions were already filled. R. at 36-37. Renner indicated that she again tried to return to work as a sewer line photo inspector on a part-time basis in May 2014 but only lasted a month before having to leave again. R. at 45-

46. Renner also stated that she uses a cane on a limited basis but did not use the cane when she attempted to work. R. at 37-38.

Renner testified that she is able to take care of her four-year old son with her mother's assistance. R. at 40. She further stated that her mother helps her with laundry, vacuuming, and walking her dogs. R. at 41. Renner also testified that she is responsible for doing the dishes but that it usually takes her twenty minutes to finish and that she must typically take a break while doing them. R. at 41-42. Renner further indicated that that she does not drive anymore except to drive her son down the street to his preschool and back two days every week. R. at 40. When asked about her medical records that showed she had contracted poison ivy, Renner stated that she contracted it simply by being outside in her yard. R. at 38. Renner also admitted that she tried to help her mother move a small freezer by pushing the freezer sideways. R. at 39, 43-44.

In addition to her knee pain, Renner stated that she has experienced some migraines and symptoms of depression as a result of her condition. R. at 44. Renner testified that she was currently taking a medication for her thyroid, Wellbutrin for depression, and Percocet for the pain in her knees. R. at 38. She indicated that Kimberly Franklin, M.D. ("Dr. Franklin"), had prescribed her Percocet after her prior pain specialist, Robert Kravitz, M.D. ("Dr. Kravitz"), had retired. R. at 38-39. She also stated that she experiences drowsiness as a side effect of her medications. R. at 45.

When describing the pain in her knees, Renner testified that her knees feel restless if she is sitting for too long. R. at 42. She stated that she can sit for about ten minutes at a time and then has to stand. R. at 42. Renner also indicated that she can stand in place for about five to ten minutes at a time before she begins experiencing throbbing in her

3

knees. R. at 42-43. She further testified that she can walk for about five to ten minutes at a time and can lift a gallon of milk, but can no longer pick up her son. R. at 43.

## C. RELEVANT MEDICAL EVIDENCE

### 1. Treatment Records

On January 11, 2012, Renner presented to Gregory Hardin, M.D. ("Dr. Hardin"). R. at 207-208. Upon examination, Dr. Hardin found that Renner was guarding and held her knee in a flexed position. R. at 207. Dr. Hardin also noted that Renner's range of motion was limited with regard to flexion and extension and that Renner had an antalgic limp. R. at 207-208. Renner underwent MRIs on both of her knees that same day, which revealed that she suffered from patellofemoral degenerative joint disease in her right knee and a patellar cartilage defect in her left knee. R. at 194-197, 221-222. To resolve Renner's knee pain, Dr. Hardin performed surgeries on each of Renner's knees in the summer of 2012. R. at 202, 233.

On August 13, 2012, Renner returned to Dr. Hardin for a follow-up examination. R. at 203, 225, 294. Dr. Hardin noted that Renner was "progressing well and as expected" following her knee surgeries and that her range of motion had progressed to nearly full range of motion. *Id.* During this examination, Renner also informed Dr. Hardin that she had returned to work the previous week. *Id.* Renner again presented to Dr. Hardin for a post-surgical examination on September 21, 2012. R. at 202, 224. During this examination, Dr. Hardin continued to indicate that Renner was "progressing well" and recommended certain medications to help alleviate any further symptoms. *Id.*

On October 29, 2012, Renner visited Dr. Hardin, complaining of continued bilateral knee pain. R. at 218, 239. Dr. Hardin gave Renner an injection of Synvisc One to help

4

alleviate her pain. *Id.* On November 16, 2012, Renner again visited Dr. Hardin and indicated the injection did not help. R. at 209, 237. Dr. Hardin recommended that Renner continue with non-surgical treatments and referred her to pain management to help control her symptoms. R. at 210, 238.

On December 26, 2012, Renner presented to Dr. Kravitz for further treatment for her knee pain. R. at 261. Dr. Kravitz did not believe Renner was a candidate for additional surgery at that time. *Id.* He also found that Renner had some guarding and some antalgia, but had normal strength and had "no weakness whatsoever." *Id.* Dr. Kravitz prescribed Mirapex for expected restless leg syndrome and a Votaren gel. R. at 262.

On January 25, 2013, Renner underwent an MRI, which revealed a high grade anterior compartment chondromalacia in both of her knees. R. at 259, 263-264, 271. Dr. Kravitz analyzed Renner's new MRI and prescribed Percocet to help with her knee pain on February 4, 2013. R. at 259. Dr. Kravitz also referred Renner for a surgical opinion. *Id.*

On February 25, 2013, Renner presented to John B. Meding, M.D. ("Dr. Meding"), for an evaluation and surgical opinion. R. at 269. Dr. Meding noted that Renner ambulated with an antalgic component bilaterally, had no pain with flexion or internal rotation of her hip, and had symmetric range of motion in her knees. *Id.* He further found that Renner tested positive for crepitation with her active range of motion. *Id.* Dr. Meding discussed his findings and the possibility of a Fulkerson tibial tubercle osteotomy surgical procedure with Renner. R. at 270. However, Renner indicated that she did not want to pursue this surgical treatment and could live with her condition as it was. R. at 250, 258, 270.

On March 4, 2013, Renner reported to Dr. Kravitz that the Percocet was helping to reduce her knee pain. R. at 250, 258. At that time, Renner rated her worst pain level as a four out of ten and her best pain level as a two out of ten. *Id.* Upon review of Dr. Meding's findings and Renner's opposition to surgery, Dr. Kravitz agreed that it was acceptable for Renner to not pursue additional surgical treatment. *Id.*

Although Renner had presented to Dr. Franklin in 2011, R. at 321-324, Dr. Franklin became Renner's primary physician in May 2014, after being "fired" by her prior pain clinic and Dr. Kravitz's retirement. R. at 39, 315-316. On May 5, 2014, Dr. Franklin noted that Renner had run out of Percocet and had been experiencing 10-out-of-10 pain in her knees daily. R. at 316. Renner presented to Dr. Franklin again on July 8, 2014, after running out of Percocet a second time. R. at 314. Dr. Franklin noted that Renner did not appear to be in any distress at that time and refilled Renner's prescription for Percocet. *Id.*

On September 10, 2014, Dr. Franklin completed a physical residual functional capacity assessment regarding Renner's condition. R. at 286-288. In her assessment, Dr. Franklin opined that Renner could sit, stand, and walk for fifteen minutes each, continuously; and for a total of fifteen minutes in an eight hour work day. R. at 286. She also found that Renner could frequently lift and carry up to five pounds but never lift or carry more than five pounds. *Id.* Dr. Franklin further indicated that Renner could occasionally flex her neck but could never bend or rotate her trunk, squat, kneel, crawl, climb, reach over her head, or extend her arms. R. at 287. She additionally opined that Renner could frequently grasp with both hands but could not use pushing or pulling arm controls or perform fine manipulation with either hand and could not use her feet to perform frequent repetitive movements. *Id.* Moreover, Dr. Franklin determined that

Renner should be completely restricted from work involving unprotected heights, being around moving machinery, exposure to temperature changes and humidity, driving, and exposure to dust, gases, and fumes. *Id.* Dr. Franklin indicated that she was Renner's "attending physician" and that her opinions were based on Renner's subjective complaints and clinical observations. R. at 288. When prompted for additional comments, Dr. Franklin merely stated "Bilateral PatelloFemoral Chondromalacia." *Id.*

### 2. Social Security Administration Consultative Reviews

Although the state agency did not request a consultative examination of Renner, state agency medical consultants, J.V. Corcoran, M.D. ("Dr. Corcoran"), and Bruce Whitley, M.D. ("Dr. Whitley"), performed consultative reviews of Renner's medical records. R. at 52-68. On March 26, 2013, after reviewing all of the medical evidence available at that time, Dr. Corcoran opined that Renner could lift or carry twenty pounds occasionally and ten pounds frequently. R. at 55. He also stated that Renner could sit for a total of six hours in an eight-hour workday and could stand or walk for a total of two hours in an eight-hour workday. *Id.* Dr. Corcoran further opined that Renner could occasionally climb ramps, stairs, ladders, ropes, and scaffolds and could occasionally balance, stoop, kneel, crouch, or crawl. *Id.* Moreover, Dr. Corcoran indicated that Renner would have limited ability to push or pull with her lower extremities and should avoid walking on wet, uneven surfaces and climbing at unprotected heights. R. at 55-56. Based on his evaluation, Dr. Corcoran determined that Renner was not disabled and recommended that Renner could perform sedentary work based on her limitations. R. at 57. Dr. Whitley also reviewed all of Renner's medical records and affirmed Dr. Corcoran's conclusions on May 10, 2013. R. at 63-68.

## D. VOCATIONAL EXPERT TESTIMONY

Vocational expert, Constance Brown ("VE"), testified at the hearing on October 9, 2014. R. at 48-50. The VE reviewed Renner's relevant work history as well as the exertion level and other skill levels associated with them. R. at 48. The ALJ asked the VE to opine on what jobs would be available for a hypothetical person of Renner's age, education, and work experience that could lift, carry, push or pull ten pounds occasionally and five pounds frequently; could stand and walk for five to ten minutes at a time and for a total of two hours in an eight-hour workday; could sit without limitation; could not crouch, kneel or crawl but could occasionally balance and stoop; and could occasionally climb stairs or ramps but no ladders, scaffolds, or ropes. R. at 48-49. The VE testified that such an individual could not perform Renner's past work as a sewer line photo inspector or material handler, which required medium skilled work, but that this hypothetical person could perform other jobs requiring sedentary, unskilled work. *Id.* The VE stated that an individual meeting these standards could be a Credit Authorizer, with over 400 available jobs in Indiana and over 52,000 available jobs nationally; an Audit Clerk, with over 1,300 available jobs in Indiana and over 70,000 available jobs nationally; or a New Account Clerk, with over 800 available jobs in Indiana and over 55,000 available jobs nationally. R. at 49. When the ALJ asked the VE to consider the same hypothetical person but added that this person would also be off task for approximately ten to fifteen minutes every hour, the VE stated that this limitation would preclude competitive employment. *Id.*

In response to questions from Renner's counsel, the VE further opined that a person of Renner's age, education, and experience meeting the description of the ALJ's

initial hypothetical person but that would be absent from work approximately three days each month could not sustain competitive full-time employment. R. at 50.

### E. RELEVANT ASPECTS OF THE ALJ'S DECISION

The ALJ found that Renner met the insured statute requirements of the Social Security Act through December 31, 2017. R. at 19. He also found that Renner had not engaged in substantial gainful activity since the alleged onset date of December 22, 2012, despite Renner's unsuccessful attempts to work on multiple occasions for less than three months at a time. *Id.* Further, the ALJ found that Renner suffered from severe impairments of degenerative joint disease of the knees and mild obesity. *Id.* The ALJ declined to consider Renner's history of infrequent migraine headaches as a severe impairment because her migraines caused no more than minimal limitations in Renner's ability to perform basic work activities. R. at 20.

Moreover, the ALJ concluded that Renner did not have any impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d) and 416.926). *Id.* To make this conclusion, the ALJ considered Renner's physical impairments in relation to Listing 1.02, Major Dysfunction of the Joint(s) (Due to Any Cause); however, the ALJ determined that the medical evidence did not demonstrate that Renner had (1) an anatomical deformity or chronic joint pain and stiffness with signs of limitations of motion or abnormal motion in the affected joints or (2) joint space narrowing, bony destruction, or ankyloses in the affected joints creating an inability to ambulate effectively. *Id.* Despite noting that no listing exists for obesity, the ALJ also considered Listings 1.00Q, 3.00I, and 4.00F in relation to

Renner's obesity, but he found that Renner's condition did not meet any of these Listings. *Id.*

After carefully considering the entire record, the ALJ determined that Renner had the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except that she can only lift, carry, push, or pull ten pounds occasionally and five pounds frequently. *Id.* The ALJ further found that Renner can stand and walk for two hours in an eight-hour workday at brief intervals of five to ten minutes spread evenly throughout the day and can sit for up to eight hours per day but must have the opportunity to stand at her workstation for up to five minutes each hour at her discretion. *Id.* The ALJ also determined that Renner could occasionally stoop, balance, and climb stairs or ramps but could never crouch; crawl; kneel; or climb ladders, ropes or scaffolds. *Id.*

In determining Renner's residual functional capacity, the ALJ found that Renner's testimony was not entirely credible in light of the medical evidence available, including evidence that Renner had no weakness in her lower extremity in December 2012, and evidence that Renner showed improvement from her treatments and had declined additional surgical treatment. R. at 21-22. The ALJ also considered evidence demonstrating that Renner persisted in a variety of daily living activities, such as taking care of her child, attempting to move a freezer, and going outside, that were consistent with the residual functional capacity he had assigned to her. R. at 23. The ALJ further noted that Renner had attempted to return to medium exertional level work since her alleged onset date. *Id.* The ALJ found that Renner's testimony regarding the severity of her symptoms was inconsistent with the medical evidence, including treatment notes from Dr. Franklin indicating that Renner appeared well and was not in distress. *Id.* The ALJ

further stated that Renner had made several inconsistent statements that detract from her credibility, such as testifying that she does not drive but later admitting that she drives her son to preschool.  *Id.*

The ALJ gave great weight to the opinions of Dr. Corcoran and Dr. Whitley because their opinions were consistent with the record as a whole and supported by the objective medical evidence.  *Id.*  The ALJ, however, gave minimal weight to the physical residual functional capacity opinion rendered by treating physician Dr. Franklin on September 10, 2014, because the extreme restrictions Dr. Franklin found were supported by Renner's subjective complaints but not the objective medical evidence.  R. at 23-24.

The ALJ adopted the VE's opinion that Renner could not perform her past relevant work.  R. at 24.  The ALJ further adopted the VE's opinion that a person with Renner's residual functional capacity, age, education, and work experience could perform the following jobs, which were available in significant numbers in the national and local economy: Credit Authorizer, Audit Clerk, and New Account Clerk.  R. at 24-25.  Accordingly, the ALJ concluded that Renner was not disabled.  R. at 25.

## II.  STANDARD

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423.  "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423 (d)(1)(A).  To determine whether or not a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

    I.       If the claimant is employed in substantial gainful activity, the claimant is not disabled.

> II. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.
>
> III. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.
>
> IV. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.
>
> V. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *See Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also*, *Craft*, 539 F.3d at 673. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). *See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004))). An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Craft*, 539 F.3d at 673.

### III. ANALYSIS

Renner asserts that the ALJ improperly discredited her hearing testimony. Dkt. No. 10 at 11-20. Specifically, Renner argues (1) that her credibility should have been enhanced, rather than diminished, because she attempted to go back to work and (2) that the ALJ did not properly address all of the factors articulated in SSR 96-7p when minimizing Renner's credibility. *Id*. In response, the Commissioner asserts that the ALJ is not required to address each of the SSR 96-7p factors in his opinion and that the ALJ's credibility determination was well supported by the evidence in the record. Dkt. No. 17 at 7-15.

Because an ALJ is in the best position to determine a claimant's truthfulness, a reviewing court "will not overturn an ALJ's credibility determination unless it is patently

wrong." *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotations omitted).  When assessing the credibility determination, the Court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Only when the determination lacks any explanation or support will it be considered patently wrong.  *Id.* at 413-14.

The Court concludes that the ALJ reasonably evaluated the credibility of Renner's hearing testimony.  While the ALJ described the SSR 96-7p factors for determining a claimant's credibility, such as the claimant's daily living activities; the location, frequency, duration, and intensity of the claimant's pain or symptoms; and effects of the claimant's medications and other treatments, R. at 23, the ALJ was not required to address each individual factor when determining Renner's credibility as long as he provided enough reasoning to build a logical bridge between the evidence available and his conclusions.  *See Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009); *see also, Craft*, 539 F.3d at 673; *Diaz*, 55 F.3d at 307.

The ALJ cited objective medical evidence that showed Renner's pain had improved with treatment, which is inconsistent with the severe symptoms Renner described in her hearing testimony.  R. at 21-23.  The ALJ also explained that he believed Renner's credibility suffered because her testimony included several inconsistencies, including her testimony that she does not drive but that she drives her son to preschool.  R. at 23.  Moreover, the ALJ indicated that Renner's daily living activities, such as taking care of her son, were consistent with the residual functional capacity he assigned to her.  *Id.*  The ALJ further explained that Renner's belief that she could perform medium exertional level work and her attempts to return to such work despite her knee

14

impairments demonstrated that Renner could likely at least perform sedentary work. R. at 24. Based on these justifications, the ALJ was not "patently wrong" when he found that Renner's testimony was not entirely credible.

Renner also argues that the ALJ failed to give proper weight to Dr. Franklin's physical residual functional capacity opinion because a treating physician's opinion is generally given controlling weight. Dkt. No. 10 at 21-23. The Commissioner, however, contends that the ALJ properly gave Dr. Franklin's opinion little weight because it is based only on Renner's subjective complaints and is not supported by objective medical evidence. Dkt. No. 17 at 15-19.

"A treating physician's opinion is entitled to controlling weight so long as it is supported by objective medical evidence and is consistent with other substantial evidence in the record." *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)). An ALJ may reject a treating physician's opinion if there is no objective evidence or if substantial evidence of record contradicts the treating physician's opinion, but he "must articulate good reason for doing so." *Luster*, 358 Fed. Appx. at 740. Indicating that the medical evidence does not support the treating physician's opinion is considered a "good reason" for an ALJ to discredit that treating physician's opinion. 20 C.F.R. § 404.1527(c)(3).

The Court agrees with the Commissioner that the ALJ provided sufficient reasoning to discredit Dr. Franklin's physical residual functional capacity opinion. The ALJ explained that Dr. Franklin's opinion, which provided for extreme restrictions, was supported by Renner's subjective complaints, rather than the objective medical findings.

R. at 23-24. The ALJ also described in detail the objective medical evidence in the record, including Dr. Franklin's own objective findings, which did not support Dr. Franklin's suggested strict restrictions. R. at 21-22. Because the objective medical evidence was not consistent with the extreme restrictions Dr. Franklin recommended for Renner, it was reasonable for the ALJ to conclude that Dr. Franklin's opinion did not deserve controlling weight.

### IV. **CONCLUSION**

For the reasons stated herein, the Court has concluded that Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, did not err in finding that Renner was not disabled under Title II of the Social Security Act, 42 U.S.C. § 423. Therefore, this Court **AFFIRMS** the Commissioner's decision. The Court will enter judgment accordingly.

IT IS SO ORDERED this 7th day of March, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Kathryn E. Olivier
UNITED STATES ATTORNEY'S OFFICE
kathryn.olivier@usdoj.gov